IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

NORTHERN DIVISION

NO. 2:26-CV-

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | |
| EVERETT LARABEE, | ) | **JURY DEMAND** |
| GOLDMINE HARVEST FARMS, LLC, and | ) | |
| JASON A. WINSLOW, | ) | |
| | ) | |
| Defendants. | ) | |

The United States of America, by and through the United States Attorney for the

Eastern District of North Carolina, hereby files this Complaint and states as follows:

## INTRODUCTION

1.     This is an action brought by the United States of America ("United States"

or "Government") to recover statutory damages, civil penalties, and investigative costs

under the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq. ("the False Claims Act" or

"the FCA").  The Government also brings this action to recover all available damages

and other monetary relief under the common-law or equitable theories of fraud, unjust

enrichment, and payment by mistake of fact.

2.     Defendants Everett Larabee, Goldmine Harvest Farms, LLC, (hereafter

"Goldmine") and Jason A. Winslow made and caused false claims and participated in

fraudulent schemes, including causing false certifications and false statements on

claims to the United States Department of Agriculture Risk Management Agency

("RMA") and USDA Farm Service Agency ("FSA"), false eligibility statements and

1

certifications as to insurable interests and farming operations, and false statements in RMA Prevented Planting indemnity documents.

3. The Government's claims arise out of the Defendants' knowingly (including reckless disregard and deliberate ignorance) and routinely making and causing false statements to RMA and FSA to wrongfully obtain payments.

4. Defendant Everett Larabee used Goldmine and his father Lawrence Larabee to hide his crops in order to make and cause false claims to RMA and FSA.

5. Defendants Goldmine and Jason Winslow, at Defendant Everett Larabee's direction, caused false claims and false statements in support of false claims to RMA and FSA.

6. To do so, Defendants caused false statements on RMA and FSA forms and manipulated farm information reported by Goldmine and Lawrence Larabee, and at Defendant Everett Larabee's direction, knowingly submitted false and fraudulent documents to enroll in RMA and FSA programs and seek RMA and FSA payments. By falsely claiming crops through Goldmine and Lawrence Larabee, Defendant Everett Larabee fraudulently obtained RMA and FSA payments that were funneled to him for his personal benefit.

7. The Defendants are liable for causing false claims and participating in fraudulent schemes, including causing false applications, false acreage reports, false production worksheets, and false eligibility statements, as well as false certifications as to insurable interests and farming operations, other false statements to RMA and FSA.

8. The USDA Acreage Reports, Production Worksheets, Farm Operating Plans, and other RMA/FSA documents were false for each of the Defendants, including

2

as to insurable interests and farming operations, and both RMA and FSA certifications were false.

9. Specifically, Defendants wrongfully obtain approximately $200,000 in false RMA payments paid through Lawrence Larabee for the 2018-19 crop years, approximately $630,000 in false RMA payments through Goldmine for the 2019-21 years (through a straw entity Everett Larabee created with his cousin Jason Winslow), and approximately $370,000 for various Prevented Planting RMA payments for the 2019-20 years, for a total of more than $1,200,000 in single damages, and Defendants also shifted the yields between and among the insured farms and falsely stated eligibility information in order to obtain additional RMA and FSA payments. In total, Defendants wrongfully obtained more than $2,000,000 in false RMA payments, and wrongfully obtained additional FSA payments in amounts to be determined.

10. This action is brought by the United States of America to recover this money—and the statutory treble multiplier and civil penalties—under the False Claims Act, 31 U.S.C. § 3729 et seq., and to recover all available damages for common law fraud and unjust enrichment.

11. Defendants systematically presented false forms and false documents as part of a scheme to obtain RMA indemnity payments in order to circumvent eligibility requirements and maximize indemnity payments, all in blatant disregard of RMA requirements.

12. Defendant Everett Larabee was paid at least $2,000,000 for false claims in the 2018-2022 crop years, either directly or through other entities.

13. These schemes—the crop insurance scheme and the benefit payment scheme—are detailed more fully below.

## JURISDICTION AND VENUE

14. This action arises under the False Claims Act, 31 U.S.C. § 3729, <u>et</u> <u>seq.</u>, as amended, and the common law. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1331, and 31 U.S.C. § 3732(a).

15. Venue is proper in the Eastern District of North Carolina pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a). Specifically, at minimum, the Defendants reside, can be found, and transact business in the Eastern District of North Carolina within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a). Moreover, a substantial part of the events or omissions giving rise to this complaint – <u>i.e.</u>, many of the acts proscribed by the federal False Claims Act – also occurred within this District.

## PARTIES

16. Plaintiff United States is acting on behalf of its agency, the United States Department of Agriculture Risk Management Agency ("RMA") and Farm Service Agency ("FSA"). RMA and FSA are agencies and instrumentalities of the United States, and its activities, operations, and contracts are paid from federal funds.

17. Defendant Everett Larabee was farming during 2018 to 2022, and submitted forms, statements, and claims to RMA and FSA in his name and through both Lawrence Everett and Goldmine. On information and belief, Everett Larabee is a citizen of North Carolina and a resident of Pasquotank County.

4

18. Jason Winslow participated in these schemes in 2018 to 2022, and was farming during 2015 to 2017 as an individual. On information and belief, Jason Winslow is a citizen of North Carolina and a resident of Perquimans County.

19. Jason Winslow and Everett Larabee formed Goldmine Harvest Farms, LLC, in 2017. Goldmine Harvest Farms was a farming entity during 2017 through at least 2021, and does business in Perquimans Counties in North Carolina.

20. Defendants understood RMA and FSA requirements and obtained millions from RMA and FSA during 2018 through 2022.

## LEGAL BACKGROUND

21. The False Claims Act establishes liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" (31 U.S.C. § 3729(a)(l)(A)); "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" (31 U.S.C. § 3729(a)(l)(B)); or "conspires to commit a violation" of these provisions (31 U.S.C. § 3729(a)(l)(C)).

22. "Knowingly" is defined under the FCA to include not just actual knowledge, but also reckless disregard and deliberate ignorance, and requires no proof of specific intent to defraud. 31 U.S.C. § 9729(b)(l).[1]

23. Defendants are liable under the FCA because Defendants knowingly presented or caused to be presented false or fraudulent claims to RMA that violate the FCA and RMA payment requirements; knowingly made or used, or caused to be made

---

[1] As used in this complaint, all references to Defendants' knowledge are intended to encompass actual knowledge, deliberate ignorance, and reckless disregard.

5

or used, false records or statements material to a false or fraudulent claim, and conspired to violate the FCA.

24.     The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), available at 1986 U.S.C.C.A.N. 5266.

25.     First, a defendant violates the FCA when the defendant "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Under the FCA, a claim includes a request for money. *Id.* § 3729(b)(2). Further, a claim is "false or fraudulent" under the FCA if the entity or person submitting the claim was not entitled to payment.

26.     Second, a defendant violates the FCA when the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

27.     Third, a defendant violates the FCA when the defendant "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

28.     Further, Defendants' failure to comply with RMA and FSA policies and requirements for the claims made and submitted was material to the RMA and FSA Programs' decisions to pay.

## GENERAL FACTUAL ALLEGATIONS

29.     In 2018-2022, Defendants routinely made or caused false claims, and submitted or caused the submissions of false forms and false statements, to RMA and FSA.

6

30.     In 2018-2022, Defendant Everett Larabee routinely submitted and caused the submissions of false forms, statements, and claims to RMA and FSA through and in the name of Lawrence Larabee.

31.     In 2018-2022, Defendants Everett Larabee and Jason Winslow routinely submitted and caused the submissions of false forms, statements, and claims to RMA and FSA through and in the name of Goldmine.

### A.     Farm Service Agency Benefit Programs

32.     At all relevant times, the U.S. Department of Agriculture administered farm programs that provide benefits in the form of cash payments to eligible recipients. These programs were put in place to protect the economic stability of the country's agricultural system.

33.     More specifically, these programs provided benefits to assist the nation's farmers by minimizing the risks that come when a farmer's livelihood is tied to the production of crops. Crop production can drastically fluctuate in any given year. A good mixture of sun and rain coupled with a high demand for the crops can generate a "bumper" crop year for the farmer. A bad storm, drought, insect invasion, or a reduced demand can devastate a farmer—many of whom live crop year to crop year—in just one year, forcing the farmer to abandon the venture altogether.

34.     Federal benefit programs help reduce the risk and uncertainty facing farmers, ensuring a strong agricultural system for the national welfare.

35.     These program benefits were designed to be as accessible to farmers as possible. To that end, enrollment in these benefit programs typically involved a self-certification process, relying on the farmer to provide truthful and complete

7

representations to the programs for the farmer to obtain, and the program to provide, the federal benefits.

36.     Congress established FSA to award benefit payments to enrolled farmers based, in part, on a farmer's farming acreage in a given county, as well as the commodity or crop produced.

37.     Payments are made from the United States through FSA and the Commodity Credit Corporation ("CCC"), an instrumentality of the United States, provided that the recipient qualified under the relevant regulations for participation in the program.

38.     To enroll farmland for participation in FSA programs, a farmer was required to truthfully complete and sign a Form CCC-502 or CCC-902 ("Farm Operating Plan For Payment Eligibility").

39.     The FSA form stated that only a "producer" is eligible to receive any payments.   A producer, in turn, was defined as an owner, operator, landlord, tenant, or sharecropper who both (1) shares in the risk of producing a crop and (2) is entitled to share in the crop available for marketing from the farm or would have shared had the crop been produced. See 7 C.F.R. § 718.2 (defining "producer").

40.     Each producer is required to file a farm operating plan with FSA regarding each crop year.

41.     The Form CCC-502 or CCC-902 required the producer to list all tracts of land farmed by the producer. The form required the producer to answer a series of questions regarding the farming operations on this land to determine whether the individual requesting benefits truly was a producer with an interest in the crop. For

8

example, the form required the producer to list the source(s) of capital, equipment, custom services, labor, and management used in farming the land.

42. When the individual requesting benefits signed a Form CCC-502 or CCC-902 and submitted it to FSA, the individual certified the following:

I certify that all the information entered on this document and any supporting documentation is true and correct. I understand furnishing incorrect information will result in forfeiture of payments and the assessment of a penalty. I will timely provide written notification to the Farm Service Agency committees … of any changes in this farming operation.

### B.    Federal Crop Insurance Programs

43. In 1938, Congress passed the Federal Crop Insurance Act ("FCIA"), Pub. L. No. 110-234, which is designed to promote the national welfare by improving the economic stability of agriculture through a sound system of multi-peril crop insurance.

44. In 1996, USDA created the Risk Management Agency ("RMA") to manage the Federal Crop Insurance Corporation ("FCIC"), a wholly-owned government corporation that administers the federal crop insurance program.

45. The FCIC operates through insurance companies authorized to provide federal crop insurance. The FCIC pays these companies an administrative operating subsidy to sell and service crop insurance policies. These insurance companies are referred to as Approved Insurance Providers or "AIPs."

46. The FCIC pays a premium subsidy—also known as a risk subsidy—to the AIP, on behalf of each insured farmer. The FCIC then reimburses the AIPs in the event indemnity payments are made to the insured farmers.

9

47. AIPs provide—and the Government reimburses—multi-peril crop insurance, which is designed to help farmers manage the risk of producing a crop.

48. Multi-peril crop insurance covers crop production loss and lost revenue based on the reduction in the market price if the loss was caused by a naturally occurring event, such as excess rain, flood, or drought.

49. This insurance operates through a producer certification program, requiring farmers to certify and submit truthful and complete information in their insurance applications and any loss insurance claims.

50. While multiple AIPs provided FCIC-backed multi-peril crop insurance, each AIP insurance policy contained the same set of terms and conditions, defined by regulation in 7 C.F.R. § 457.8, that are included in policies as Common Crop Insurance Policy Basic Provisions ("Basic Provisions"). Exhibit 1, Basic Provisions

51. As set forth in the Basic Provisions, the scope of federal crop insurance is tied to and limited by crops in which the beneficiary has a legitimate interest.

52. More specifically, insurance coverage attaches to "basic units," which is an insurable acreage of the insured crop in the county on the date coverage begins for the crop year in which the insured—referred to as the producer—has a one-hundred percent crop share or which is owned by one person and operated by another person on a share basis.

53. The Basic Provisions defined "share" as the producer's insurable interest in the insured crop as an owner, operator, or tenant.

54. An "insurable interest" was defined as the producer's percentage of the insured crop that is at financial risk.

10

55.     The Basic Provisions stated that insurance only attaches if the producer has a share in the insured crop and only to the extent of that person's share.

56.     In order to establish coverage of basic units, the Basic Provisions required the producer to first submit an application for insurance to the AIP with crops, coverage, insurance plan options, and intended acres. The application is continuous until cancelled or changed.

57.     The applicable Crop Insurance Policy (codified at 7 CFR 457.8), provides for claims where planting was prevented, in part at follows:

> **Prevented planting** - Failure to plant the insured crop by the final planting date designated in the Special Provisions for the insured crop in the county, or within any applicable late planting period, due to an insured cause of loss that is general to the surrounding area and that prevents other producers from planting acreage with similar characteristics. Failure to plant because of uninsured causes such as lack of proper equipment or labor to plant acreage, or use of a particular production method, is not considered prevented planting.

58.     Each year, the policy requires an actual (post-planting) acreage report. The acreage report required that the producer certify the amount of acreage of the crop in the county for which that producer had a share along with the producer's share in that crop.

59.     If the producer did not have a share in the insured crop, the producer was required to submit that information on the Acreage Report.

60.     This information was required under the Basic Provisions because it was critical to how the FCIC-backed AIP determined basic crop unit structure and calculated whether a loss had occurred.

61.     If a producer did not disclose all crops in which that producer has a share in that county, the producer could obtain more favorable guarantees on the crop

11

insurance policy than the producer otherwise would be eligible for if the producer were honest.

62.     The Basic Provisions directed that, in the event of a loss, the AIP would pay an indemnity if the producer established (1) the total production or value received for the insured crop on the unit; (2) that any loss occurred during the insurance period; (3) that the loss was caused by one or more of the insured caused specified in the Basic Provisions; and (4) that the producer had complied with all provisions of the Basic Provisions.

63.     The Basic Provisions warned against concealment, misrepresentation, or fraud, which would void the entire policy and require reimbursement of all indemnities paid.

64.     More specifically, the Basic Provisions stated: "If you have falsely or fraudulently concealed the fact that you are ineligible to receive [federal crop insurance benefits] or if you or anyone assisting you has intentionally concealed or misrepresented any material fact relating to this policy ... [t]his policy will be voided." See, Exhibit 1, Basic Provisions.

65.     The Basic Provisions stated that if a policy was voided, the person may be subject to remedial sanctions, must pay twenty percent of the premium the person otherwise would have been required to pay, and must reimburse all indemnities paid for the crop year in which the voidance was effective. See, Exhibit 1, Basic Provisions.

66.     Further, the Basic Provisions warned: "If you willfully and intentionally provide false or inaccurate information to us or FCIC or you fail to comply," the FCIC may impose a civil fine for each violation. See, Exhibit 1, Basic Provisions.

12

### C. Defendants Caused Straw Farming Operators to Obtain Fraudulent Federal Crop Insurance Claims.

67.     As described above, Defendant Everett Larabee directed a "Straw Farming Operation" by making false crop reports on behalf of his father, Lawrence Larabee, and coordinating with Goldmine to make false crop reports to hide actual interest in crops and farming operations in order for Defendants to falsely obtain crop insurance and benefit payments.  A "Straw Farming Operation" is an  entity or person that acts as a front for the record owner and actual producer.  Lawrence Larabee and Goldmine are hereinafter referred to as "Straw Farming Operators" in a "Straw Farming Operation."

68.     From at least 2018 through 2022, Defendants caused and directed the Straw Farming Operators to obtain multi-peril crop insurance through FCIC-backed AIPs.

69.     Defendants caused and directed these Straw Farming Operators to apply for federal crop insurance under their own names.

70.     In their crop insurance applications, Acreage Reports, and loss claims, the Straw Farming Operators falsely asserted that they had a 100% share in the insured crops.

71.     In fact, the Straw Farming Operators did not have a 100% share in the insured crops because they had no financial risk in the production of that crop.

72.     Instead, Defendant Everett Larabee bore all the risk of the production of those crops, and Defendant Everett Larabee stood to share any and all profits from the production of those crops.

13

73.    In order to facilitate this scheme, Defendant Everett Larabee himself submitted or directed the applications to the AIPs for multi-peril crop insurance on behalf of the Straw Farming Operators for those crops the straw entities had falsely certified to USDA were their own.

74.    Defendant Everett Larabee handled the entire crop insurance process for the crops falsely certified under the names of the Straw Farming Operators, including by choosing the type of crop insurance coverage, submitting or providing the documents and other required paperwork.

75.    For example, in the case of Lawrence Larabee, Everett Larabee was responsible for notifying the AIP in the event of a loss claim, and meeting with the adjustors.

76.    On information and belief, the indemnity payment false claims often paid the underlying premiums for the insurance policies for these Straw Farming Operators.

77.    In the event that the AIP paid an indemnity to cover a loss under a policy held by the Straw Farming Operators, Everett Larabee directed that this money be paid over to him, because it was his crop and he paid all the expenses.

78.    In this way, Defendant Everett Larabee caused the Straw Farming Operators to submit false claims to the FCIC-backed AIPs, and the Defendant Everett Larabee received the monies the government paid for these false claims, both through the premium subsidy payment and by the indemnities paid for any purported loss.

79.    These claims include, but are not limited to, the following examples:

**Example 1: Insurance Policy No. 825892 for the 2018 Crop Year**

80.     On July 12, 2018, RCIS Insurance ("RCIS" or "AIP"), at the direction of Defendant Everett Larabee (listed as Operator), submitted the required Acreage Report, using the FSA 578 Acreage Report, for Pasquotank County, NC, for Lawrence Larabee (listed as Producer). See, Exhibit 2, FSA 578 Report of Commodities.

81.     In the Acreage Report, Everett Larabee certified Lawrence Larabee had a 100% share in the 2018 covered crops.

82.     Defendant Everett Larabee, and not Lawrence Larabee, had a 100% share in the covered crops as Defendant Everett Larabee bore the sole financial risk in producing those crops.

83.     This Acreage Report was false.

84.     Lawrence Larabee did not have an interest in the large acres of crops in Pasquotank and Perquimans Counties that the Defendant Everett Larabee certified in Lawrence Larabee's name for 2018 or 2019.

85.     On October 16, 2018, Defendant Everett Larabee signed the Production Worksheets certifying a loss on policy 825892 crops in Pasquotank County. See, Exhibit 3, RCIS Production Worksheet Summary.

86.     On or around October 17, 2018, RCIS issued a claim check in the amount of $96,240 to Lawrence Larabee. See, Exhibit 4, $96,240 RCIS Check.

87.     On or around October 19, 2018, at the direction of Defendant Everett Larabee, Lawrence Larabee writes a check to Defendant Everett Larabee for $96,240, with the memo "RCIS Ins Payment". See, Exhibit 5, $96,240 Lawrence Larabee Check.

88.     On the same day, the Defendant Everett Larabee deposits the check in his account with the note "2018 corn Ins reimbursement from Dad". See, Exhibit 5, $96,240 Lawrence Larabee Check.

89.     On or around February 6, 2019, Defendant Everett Larabee signed the production worksheets certifying a loss on policy 825892 crops in Pasquotank County. See, Exhibit 6, RCIS Production Worksheet Summary.

90.     On or around February 7, 2019, RCIS issued a claim check in the amount of $103,867 to Lawrence Larabee.  See, Exhibit 7, $103,867 RCIS Check.

91.     On or around February 15, 2019, at the direction of Defendant Everett Larabee, Lawrence Larabee writes a check to Defendant Everett Larabee for $100,528.28, with the memo "Rem - funds".  See, Exhibit 8, $100,528 Lawrence Larabee Check.

92.     On February 20, 2019, Defendant Everett Larabee deposits the check in his account with the note "SB crop Ins (LNL) ck".   See, Exhibit 8, $100,528 Lawrence Larabee Check.

93.     If the FCIC, working in and through the AIP, had known that Lawrence Larabee did not have a share in the crops, it would not have provided him with the crop insurance, would not have paid his premium subsidy, and would not have issued an indemnity payment.

94.     However, based on the 2018 fraudulent application for crop insurance and fraudulent loss claim, the United States, through the FCIC, paid RCIS Insurance Company a subsidized premium of $13,214 for this crop insurance policy.

16

95. Then, on October 16, 2018, and February 6, 2019, RCIS Insurance Company issued Lawrence Larabee indemnity payments on claims totaling $200,107 based on a 100% share of the insured corn crop in Pasquotank County.

96. As stated above, upon receipt of the indemnity checks, Lawrence Larabee, at the direction of Defendant, reimbursed Defendant Everett Larabee.

**Example 2: Crop Insurance No. 825892 & 825893 for 2019 Crop Year**

97. On March 6, 2019, Defendant Everett Larabee signed a Production and Yield Report Worksheet in the name of Lawrence Larabee for RCIS policies 825892 & 825893, certifying the 2018 crop year acres, shares and production are true for Pasquotank and Perquimans Counties, knowing it was not. See, Exhibit 9 and 10, RCIS Production and Yield Report Worksheets.

98. On July 19, 2019, RCIS, at the direction of Defendant, Everett Larabee submitted the required Acreage Report, using the FSA 578 report, for Policy 825892, Pasquotank County, NC for Lawrence Larabee. See, Exhibit 11, Report of Commodities.

99. In the Acreage Report, Everett Larabee certified Lawrence Larabee had a 100% share in the covered crops.

100. Defendant Everett Larabee, and not Lawrence, had a 100% share in the covered crops as Defendant Everett Larabee bore the sole financial risk in producing those crops.

101. This Acreage Report was false.

102. Lawrence Larabee did not have an interest in 2019 in the large acres of crops in Pasquotank and Perquimans Counties that the Defendant Everett Larabee certified in Lawrence Larabee's name.

17

103. On March 9, 2020, at the direction of Defendant Everett Larabee, Lawrence Larabee signed a Production Worksheet reporting soybean production was less due to excess precipitation during July 2019 in Pasquotank County, North Carolina. See, Exhibit 12, Production Worksheet.

104. Defendant Everett Larabee was the contact with the loss adjuster and provided the production records to the loss adjuster.

105. The soybean deliveries supporting the Production Worksheet were between October 12, 2019, and November 26, 2019, and according to the loss adjuster, Everett Larabee still had 100 acres of soybeans to harvest on December 16, 2019, and the loss adjuster did not pick up the soybean production records from Everett Larabee until February 4, 2020.

106. The Production Worksheet is false.

107. On December 7, 2018, RCIS, at the direction of Defendant Everett Larabee submitted the required Acreage Report, using the FSA 578 report, for Policy 825893, Perquimans County, NC for Lawrence Larabee. See, Exhibit 13, Report of Commodities Farm Summary.

108. In the Acreage Report, Everett Larabee falsely certified Lawrence Larabee had a 100% share in the covered crops.

109. In fact, Defendant Everett Larabee, and not Lawrence, had a 100% share in the covered crops as Defendant Everett Larabee bore the sole financial risk in producing those crops.

110. This Acreage Report was false.

18

111. On March 19, 2019, Defendant Everett Larabee, on behalf of Lawrence Larabee, signed a statement of intention to plant winter wheat and provided it to the loss adjuster along with a Parkway Ag Supply LLC receipt for wheat seed, dated October 15, 2018, issued to Larry Larabee. See, Exhibit 14, Larabee Statement.

112. No wheat seed was purchased, as there is no record of the October 15, 2018, receipt at Parkway Ag Supply LLC.

113. On August 27, 2019, Defendant Everett Larabee, on behalf of Lawrence Larabee, signed a Production Worksheet certifying the prevent plant claim date, cause of loss, acres and insurable share. See, Exhibit 15, Production Worksheet Summary.

114. The Production Worksheet is false. Defendant Everett Larabee, and not Lawrence Larabee, had a 100% share in the covered crops as Defendant Everett Larabee bore the sole financial risk in producing those crops.

115. If the FCIC, working in and through the AIP, had known that Lawrence Larabee did not have a 100% share in the crops insured under policies 82592 and 82593, it would not have provided him with the crop insurance, it would not have paid his premium subsidy, and it would not have issued an indemnity payment.

116. However, based on Lawrence's fraudulent crop insurance reports and fraudulent loss claim, the United States, through the FCIC, paid a subsidized premium of $7,910.00 for these crop insurance policy.

117. On March 23, 2020, RCIS issued Lawrence Larabee a check for an indemnity payment of $12,092 for the loss on the soybean crops based on his purported 100% share of the crop. See, Exhibit 16, RCIS Check.

118.   On September 12, 2019, RCIS issued Lawrence Larabee a check for an indemnity payment of $1,852 (check amount following premium credits is $8,442 ) for the loss on the prevent plant winter wheat based on his purported 100% share of the crop. See, Exhibits 17 and 18, RCIS Summary of Loss and Check.

**Example 3: Crop Insurance Policy No. 259369 for the 2019 Crop Year**

119.   On August 7, 2019, RCIS, at the direction of Defendant Everett Larabee submitted the required Acreage Report, using the FSA 578 report, for Perquimans County, NC under the Goldmine Harvest Farms LLC policy. See, Exhibit 19, Report of Commodities Farm Summary.

120.   In the Acreage Report, Jason Winslow certified Goldmine's 100% share in all the covered crops.

121.   Defendant Everett Larabee, and not Goldmine or Jason Winslow, had a 100% share in the insured crops as Defendant Everett Larabee bore the sole financial risk in producing those crops.

122.   This Acreage Report was false.

123.   Defendant Everett Larabee reimburses Goldmine $131,400 for the land rent.

124.   Then, on August 28, 2019, Jason Winslow, on behalf of Goldmine, at the direction of Defendant Everett Larabee, signed a production worksheet in support of a prevent plant winter wheat loss claim. See, Exhibit 20, Production Worksheet Summary.

125.   In the production worksheet Defendant Everett Larabee represented that Goldmine had a 100% share in the entire soybean crop when, in fact, Defendant Everett

20

Larabee, and not Goldmine, had a 100% share in the covered crops as Defendant Everett Larabee bore the sole financial risk in producing those crops.

126. This record was false.

127. On February 10, 2020, Jason Winslow, on behalf of Goldmine, at the direction of Defendant Everett Larabee, signed a production worksheet in support of a soybean loss claim. See, Exhibit 21, Production Worksheet Summary.

128. In the production worksheet Defendant Jason Winslow represented that Goldmine had a 100% share in the entire soybean crop when, in fact, Defendant Everett Larabee, and not Goldmine, had a 100% share in the covered crops as Defendant Everett Larabee bore the sole financial risk in producing those crops.

129. This record was false.

130. On November 27, 2019, Jason Winslow, on behalf of Goldmine, at the direction of Defendant Everett Larabee, signed a production worksheet in support of corn loss. See, Exhibit 22, Production Worksheet Summary.

131. In the production worksheet Defendant Jason Winslow represented that Goldmine had a 100% share in the entire corn crop when, in fact, Defendant Everett Larabee, and not Goldmine, had a 100% share in the covered crops as Defendant Everett Larabee bore the sole financial risk in producing those crops.

132. This record was false.

133. On September 13, 2019, RCIS issued Goldmine a check for an indemnity payment of $58,948 ($80,460 less premium deductions) for the prevent plant claim on the winter wheat based on the false receipt and its purported 100% share of the crops. See, Exhibit 23, RCIS Checks.

21

134.    On December 5, 2019, RCIS issued Goldmine a check for an indemnity payment of $133,068 for the corn claim based its purported 100% share of the crops. See, Exhibit 23, RCIS Checks.

135.    On or around December 10, 2019, the Defendant Everett Larabee endorsed and deposited this check directly into his personal bank account. See, Exhibit 23, RCIS Check.



136.    On March 13, 2020, Goldmine Harvest Farms LLC issued a check to Everett Larabee for a payment of $175,234 for soybean expenses. See, Check below.

| PAYOR | CLEAR DATE | PAYEE | AMOUNT | CHECK # | MEMO |
|---|---|---|---|---|---|
| GOLDMINE HARVEST FARMS LLC | 3/13/2020 | RCIS | $133,688.00 | | Crop Year 2019 Claim 2556789 |
| GOLDMINE HARVEST FARMS LLC | 3/13/2020 | SMITHFIELD GRAIN | $41,546.91 | | Vendor #74559 |
| GOLDMINE HARVEST FARMS LLC | 3/13/2020 | EVERETT LARABEE | $175,234.91 | 4691 | Soybean Expenses |

22



Date:20200316 Check:0 Account: 0118 Amount:175237.91   Date:20200316 Check:0 Account: 0118 Amount:175237.91

Date:20200316 Check:4691 Account: 335 Amount:175234.91   Date:20200316 Check:4691 Account: 335 Amount:175234.91

**Example 4:  Crop Insurance Policy No. 259369 for the 2020 Crop Year**

137.   On July 15, 2020, at the direction of the Defendant Everett Larabee, Jason Winslow, on behalf of Goldmine, knowingly signed and submitted the required Acreage Report using the FSA 578 report, for Perquimans  County, NC under the Goldmine Harvest Farms LLC policy. See, Exhibit 24, Acreage Reporting Form.

138.   In the Acreage Report, Jason Winslow certified that Goldmine had a 100% share in the covered crops.

139.   In fact, Defendant Everett Larabee, and not Goldmine, had a 100% share in the covered crops as Defendant Everett Larabee bore the sole financial risk in producing those crops.

140.   This record was false.

141.   In 2020, Defendant Everett Larabee paid Goldmine $131,400 for  leasing the land to farm in Goldmine's name.

23

142. On August 20, 2020, Defendant Jason Winslow signed a Production Worksheet claiming he was prevented from planting winter wheat. See, Exhibit 25, Production Worksheet.

143. On or about August 24, 2020, Defendant Everett Larabee certified and provided copies of Meherrin receipts as evidence of their intent to plant winter wheat.

144. Meherrin has no record of wheat seed delivered, sold, or returned under the names of any of the Defendants or their entities between January 1, 2017, through April 15, 2024.

145. This document is false.

146. On December 13, 2020, Defendant Jason Winslow signed a Production Worksheet certifying Goldmine had a production loss on soybeans. See, Exhibit 26, Production Worksheet.

147. This is false because Defendant Everett Larabee, and not Goldmine, had a 100% share in the covered crops as Defendant Everett Larabee bore the sole financial risk in producing those crops.

148. The payments for Goldmine included the following:

| PAYOR | CLEAR DATE | PAYEE | AMOUNT | AMOUNT | Note/Memo |
|---|---|---|---|---|---|
| GOLDMINE HARVEST FARMS LLC | 9/1/2020 | RCIS | $ 53,210.00 | | Crop Year 2020 Claim #2581833 - WHEAT |
| GOLDMINE HARVEST FARMS LLC | 9/1/2020 | RCIS | $ 13,834.00 | | Crop Year 2020 Claim #2581833 - WHEAT |

24

| | | | | | |
|---|---|---|---|---|---|
| GOLDMINE HARVEST FARMS LLC | 1/5/2021 | RCIS | $ 20,990.00 | | Crop Year 2020 Claim# 2614175 - SOYBEANS |
| GOLDMINE HARVEST FARMS LLC | 1/15/2021 | PERDUE FARMS | $ 132,282.44 | | Perdue Farms Edi Pymts 3394 – SOYBEAN SALES |
| GOLDMINE HARVEST FARMS LLC | 1/15/2021 | PERDUE FARMS | $ 87,024.56 | | Perdue Farms Edi Pymts 3394 – SOYBEAN SALES |
| | | **TOTAL:** | **$307,341.00** | | |
| GOLDMINE HARVEST FARMS LLC | 1/28/2021 | EVERETT LARABEE | | $278,473.41 | Farm Expenses |

149.   Goldmine issued Everett Larabee a check for $278,473.41 to pay for the farming expenses that Everett Larabee claimed to have incurred for crops in the name of Goldmine Harvest.

150.   On January 19, 2021, Defendant Jason Winslow signed a Production Worksheet certifying Goldmine had a production loss on corn. See, Exhibit 27, Production Worksheet.

151.   On January 22, 2021, RCIS issued Goldmine a check for an indemnity payment of $51,971 for the corn claim based his purported 100% share of the crops. See, Exhibit 28, Checks.

152.   The production records from Smithfield Grain, provided in support of the claim, demonstrate the corn was sold under Defendant Everett Larabee's name, and all corn grain proceeds were deposited in Defendant Everett Larabee's bank account. See, Exhibit 29, Smithfield Gram Purchase Settlement Sheet, and below.



153. On or around March 30, 2021, the Defendant Everett Larabee deposited a check from Goldmine for $51,971 for "corn insurance settle". See, Exhibit 28, Checks.



## **Example 5: Crop Insurance Policy No. 259369 for the 2021 Crop Year**

154. On January 15, 2021, and again on July 8, 2021, at the direction of the Defendant Everett Larabee, and Jason Winslow, on behalf of Goldmine, knowingly

26

signed and submitted the required Acreage Report using the FSA 578 report, for Perquimans County, NC under the Goldmine Harvest Farms LLC policy. See Exhibit 30, Acreage Reporting Form.

155. In the Acreage Report, Jason Winslow falsely certified that Goldmine had a 100% share in the covered crops. In fact, Defendant Everett Larabee, and not Goldmine, had a 100% share in the covered crops as Defendant Everett Larabee bore the sole financial risk in producing those crops.

156. This record was false.

157. In 2021, Defendant Everett Larabee paid Goldmine Harvest Farms LLC $131,400 for leasing the land farmed in Goldmine's name.

158. On July 9, 2021, Defendant Jason Winslow signed a Production Worksheet claiming Goldmine was prevented from planting winter wheat due to excess precipitation in November and December 2020. See Exhibit 31, Production Worksheet Form.

159. Goldmine certified and provided copies of Meherrin receipts, dated November 15, 2020, as evidence of his intent to plant winter wheat. See, Exhibit 32, Meherrin Invoice.

160. The 2020 wheat (reportedly planted) was completed by November 11, 2020, prior to the wheat seed receipt.

161. Meherrin has no record of wheat seed delivered, sold, or returned under the names of any of the Defendants or their entities between January 1, 2017, through April 15, 2024.

162. The Production Worksheet is false.

163.  Meherrin acknowledged they provided receipts for Defendant Everett Larabee, at his request.

164.  On July 20, 2021, Defendant Jason Winslow signed a Production Worksheet claiming the wheat reported planted had a loss in production due to excess precipitation in November and December 2020.  See, Exhibit 31, Production Worksheet Summary.

165.  RCIS issued checks to Goldmine in the amount of $38,869 on July 9, 2021, and for $54,395 on August 10, 2021, and Defendant Jason Winslow deposited the checks into his account.  See, Exhibit 33, Checks.

166.  If the FCIC, working in and through the AIP, had known that Goldmine did not have a share in the crops, FCIC would not have provided it with the crop insurance, FCIC would not have paid his premium subsidy, and FCIC would not have issued an indemnity payment.

167.  However, based on the fraudulent application for crop insurance and fraudulent loss claim, the United States, through the FCIC, paid a subsidized premium for this crop insurance policy.

168.  In summary, as alleged above, the United States alleges that, from about 2018 through 2022, Defendants submitted or caused to be submitted false claims, and created or caused the creation of false records in support of those fraudulent claims, to FCIC-backed AIPs and, ultimately the federal government, for crop insurance, subsidy premium payments, and, in the event of a loss, indemnity payments, and knowingly and improperly retained such overpayments to which they were not entitled, including the

examples provided above as well as others to be identified through discovery and proven at trial.

**D.**  **Defendant Everett Larabee Falsified His Own Crop Insurance Policy Records, Causing the Government to Wrongfully Pay Him Indemnities.**

169.   By fraudulently placing Defendants' farmland and crops in the names of straw entities, and having those Straw Farming Operators falsely certify their interest in those crops, Defendant Everett Larabee falsely minimized his own holdings and thereby submitted false insurance documents, and false and fraudulent insurance claims, for crops that remained in his name.

170.   As discussed above, the Basic Provisions for every FCIC-backed multi-peril crop insurance policy stated that if a person concealed or misrepresented any material fact relating to the policy, the policy was voided. And if the policy is voided, the Basic Provisions required that person to pay back any indemnities paid for the crop year in which the policy was effective. See, Basic Provisions.

171.   In addition to being the basis of presented false claims or false records in support of such claims, voided policies, therefore, give rise to an "obligation to pay or transmit money to the Government" within the meaning of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(G) and 3729(b)(3).

172.   Also as discussed above, the Basic Provisions required that each producer certify the amount of acreage of the crop in the county for which that producer has a share.

173.   This information was required under the Basic Provisions because it was critical to how the FCIC-backed AIP determined basic crop unit structure and calculated whether a loss had occurred.

174.   If a producer did not disclose all crops in which that producer has a share in that county, the producer could obtain more favorable guarantees on the crop insurance policy than the producer otherwise would be eligible if the producer were honest.

175.   From at least 2018 through 2022, while Defendants orchestrated their scheme of falsely putting their land under the names of the Straw Farming Operators, Defendant Everett Larabee continued to seek and obtain federal crop insurance for the crops farmed on the land he kept under his own name.

176.   Each year that he did so, Defendant Everett Larabee submitted the required Acreage Report to the insurance companies as part of the process for obtaining a policy that would cover any loss.

177.   Despite the duty to disclose all crops in each county in which he had a share, Defendant Everett Larabee submitted Acreage Reports to the crop insurance companies that did not list his true share within each county because he did not include the farmland and crops listed under the names of the Straw Farming Operators.

178.   These Acreage Reports were false because, as alleged above, Defendant Everett Larabee had a share in the Straw Farming Operators' crops, including Lawrence Larabee and Goldmine, because he was the true producer of those crops.

179.   By not revealing his share in the Straw Farming Operators' crops, Defendant Everett Larabee concealed and misrepresented a material fact relating to

30

those crop insurance policies that affect the basic unit structures for those crops, thus determining how large of a guarantee would be appropriate for crops in that county, whether a loss occurs, and, if so, how much of an indemnity should be paid for that insured crop.

180. Because Defendant Everett Larabee concealed and misrepresented material facts related to these crop insurance policies, those policies were voided under the terms of the Basic Provisions. As such, Defendants were not entitled to those indemnity payments and were required to return any paid indemnities.

181. At no time have Defendants paid back any of the indemnity payments received under these voided policies.

**Example: Crop Insurance # 99360, 793066 & 793067 for 2018-2021 Years**

182. By way of example, Defendant Everett Larabee applied for a crop insurance policy for his corn and soybean crops in Camden, Pasquotank, and Perquimans counties for the 2018-2022 crop years with RCIS.

183. As discussed above, Goldmine, one of the Straw Farming Operators, also applied for crop insurance for its wheat, corn and soybean crops in Perquimans County for the 2019-2022 crop year, and Lawrence Larabee also applied for crop insurance for wheat, corn and soybean crops in Pasquotank and Perquimans Counties from 2018-2019.

184. As alleged above, Goldmine and Lawrence Larabee were not the true producer of those crops. Instead, Defendant Everett Larabee was the producer of those crops as he alone bore the financial risk in those crops.

185. For several years, despite having the true share in the wheat, corn and soybean crops in Pasquotank and Perquimans County listed under Goldmine and Lawrence Larabee's names, Defendant Everett Larabee knowingly failed to report these acres when he signed his fraudulent Acreage Reports to RCIS and FSA, his fraudulent Production and Yield Worksheets, and fraudulent Production Worksheets for claims for his personal crop insurance policy.

186. For example, in 2020, as a Straw Farming Operator, Goldmine purported to farm and produce soybean crops on Farm 2068 in Perquimans County.

187. Defendant Everett Larabee, however, was the true producer of these crops and had a share in these crops, but he knowingly did not disclose his share in these crops on his own Acreage Report.

188. Defendant Everett Larabee knowingly concealed and misrepresented his share in those crops when he signed false Acreage Reports, Production and Yield Worksheets, and Production Worksheets between 2018 and 2022 crop years and certified: "I certify to the best of my knowledge and belief that the acreage of crops/commodities and land uses listed herein are true and correct and that all required crops/commodities and land uses have been reported for the farm(s) as applicable." See, Exhibit 34 and 35, 2020 Production Worksheet Summary and 2021 Production and Yield Worksheet.

189. The Production and Acreage Reports and accompanying certifications by Everett Larabee were false.

190. In summary, as alleged above, the United States alleges that the Defendants, from about 2018 through 2022, submitted or caused to be submitted false

32

claims to the AIPs, specifically for insurance indemnities on crops held in Defendant Everett Larabee's name that were voided due to his knowing and material misrepresentations regarding his crops.

191. Defendants further made, created, and used false records and statements that were material to their false claims, and knowingly and improperly retained such overpayments to which they were not entitled, including the example provided above as well as others to be identified through discovery and proven at trial, for Defendant Everett Larabee's own voided crop insurance policies.

**F.** **Defendants Caused Fraudulent Prevent Planting Payments Claims.**

192. Defendant Everett Larabee submitted and caused to be submitted Prevent Planting claims for himself and Goldmine that were false.

**Example 1: Crop Insurance Policy # 99360, 793066, & 793067 – 2019 Crop Year**

193. Defendant Everett Larabee falsified Acreage Reports by intentionally failing to accurately certify the correct crop share, and by providing false records to make false prevent plant claims.

194. Out of all the farmers in Pasquotank, Perquimans, and Camden counties who reported 500 or more acres of winter wheat in 2019, Everett Larabee and Goldmine/Jason Winslow were the only producers who submitted Prevent Plant claims for 100% of their acreage.

195. On August 27, 2019, Defendant Everett Larabee signed a Production Worksheet certifying he was prevented from planting winter wheat. See, Exhibit 36, Production Worksheet Summary.

196.    On information and belief, this worksheet was false as he had no intent to plant winter wheat.

197.    The only producers in the farming area, with over 500 acres of winter wheat, who claimed they could not plant any seed is Defendant Everett Larabee and Goldmine /Jason Winslow.

198.    On March 19, 2019, Everett Larabee signed a statement of the intention to plant winter wheat and that seed was available.  See, Exhibit 37, Parkway Ag Supply Invoice and Statement.

199.    On October 15, 2018, Defendant Everett Larabee provided a document to the loss adjuster, with Parkway Ag Supply LLC letterhead, as verification that he had secured winter wheat seed.  See, Exhibit 37, Parkway Ag Supply Invoice.

200.    On information and belief, this is a false statement and false receipt.

201.    Defendants Everett Larabee, Lawrence Larabee, and Goldmine provided the same documents as evidence they had wheat seed available as their intention to plant winter wheat.  The documents provided are all dated October 15, 2018, from Parkway Ag.

202.    On information and belief, Defendants never took delivery of seed from Parkway Ag Supply LLC, as suggested in the documents provided in the claim file dated October 15, 2018.

203.    Further, the Parkway Ag Supply document provided was not similar to other records provided by Parkway Ag Supply LLC, during the 2018-2019 crop years, including that there are no references to an invoice number or an estimate/quote, unlike other Parkway Ag Supply records.

34

204. On August 27, 2019, Defendant Everett Larabee signed Production Worksheets for Camden, Pasquotank and Perquimans Counties claiming he was prevented from planting cotton acres. See, Exhibit 38 and 39, Production Worksheet Summaries.

205. Defendant Everett Larabee provides a Meherrin Ticket #21381, dated May 14, 2019, claiming he secured 200 bags of cotton seed. See, Exhibit 40, Meherrin Invoice.

206. The May 14, 2019, ticket references "per your original request" and Meherrin's record, provided during the investigation, includes a May 16, 2019, ticket #306642 for 70 units/bags of cotton seed.

207. On information and belief, the Meherrin ticket provided for to support this prevent claim is false.

208. Defendant Everett Larabee received $168,767 as the prevent plant indemnity payments for winter wheat and cotton acreage for the 2019 Crop Year.

**Example 2: Crop Insurance Policy # 793066– 2020 Crop Year**

209. Defendant Everett Larabee falsified Acreage Reports by intentionally failing to certify the correct crop share, and by providing false records to make false prevent plant claims.

210. On August 18, 2020, August 19, 2020, and August 24, 2020, Defendant Everett Larabee signed Production Worksheets certifying he was prevented from planting over 2,100 acres of winter wheat in Camden, Pasquotank, and Perquimans Counties. See, Exhibit 41, Production Worksheet.

211. On information and belief, this statement is false as he did not prepare for planting and did not intend to plant winter wheat.

35

212.    Again, Defendants Everett Larabee and Goldmine/Jason Winslow were the only producers in the area with over 500 acres of winter wheat who claimed they could not plant any winter wheat in 2020.

213.    On August 24, 2020, Everett Larabee signed a statement of the intention to plant winter wheat and that seed was available at Meherrin.  See, Exhibit 42, RCIS Fact Sheet.

214.    Meherrin has no record of wheat seed purchased, delivered, or returned to Defendants between January 1, 2017, through April 15, 2024.

215.    Meherrin's response to the investigation did not include any tickets or documentation for requests for winter wheat seed.

216.    Defendant Everett Larabee received $202,487 as the winter wheat prevent plant indemnity payments for the 2020 Crop Year.

**G.    Defendants Schemed To Shift Yields To Increase RMA Payments.**

217.    On information and belief, Defendants shifted their yields between farm operations and concealed actual production in order to obtain additional RMA Payments in 2018 through 2022.

218.    Production shifting is the employment of one or more methods of concealment to prevent an agent of FCIC (loss adjuster or USDA employee) from determining the true production to count realized on acreage controlled by a policyholder, either insured or uninsured.

219.    This concealment of the production of crops can unjustly benefit a policyholder by (1) inflating the amount of indemnity payment received at the end of the crop year by making the production of crops look significantly lower than what was truly

36

grown, (2) allowing another entity to unjustly inflate their insurance guarantee the following crop year by reporting extra crops they did not grow and significantly increasing their average yearly production, thus affecting the guarantee the insurance provider places on their policy, and (3) collecting payment from the sale of the very crop reported as failing by utilizing other Producer names for the transactions.

220.    Falsely reporting losses not only unjustly enriches the policyholder but also hurts all other participants in the county by increasing the loss ratios and forcing crop insurance premiums to be raised at the county level.

221.    On information and belief, Everett Larabee systematically shifted the production from and among the fields insured for Goldmine Harvest and Lawrence Larabee, and sold the crops under the names of other entities in 2018 through 2022.

222.    On information and belief, the identified fields for Everett Larabee, Goldmine Harvest, and Lawrence Larabee were too close geographically to expect materially different yields.

223.    As an example, on January 27, 2021, Everett Larabee signed Production Worksheets for Pasquotank County, certifying production losses on his soybean crop due to excess heat during July 2020 and August 2020. See Exhibit 43, Production Worksheet Summary.

224.    Farm 366 and Farm 498 were reported by Everett as being planted on June 10, 2020.  Farms 366 and 498 are about .23 miles apart at the closest points and .76 miles from the furthest points.

225.    According to the records provided by Everett and his certification on January 27, 2021, Production Worksheet, Farm 366 sustained damage due to excess

37

heat and yielded only 9.7 bushels per acre. Then on February 4, 2021, Everett

Larabee signed a Production and Yield report certifying Farm 498 yielded about 55

bushels per acre.

226. These farms were close in proximity are shown on the map below, but

had significantly different yields reported.



227. As another example, on March 1, 2022, Everett Larabee signed

Production Worksheets certifying production losses on his soybean crop due to excess

heat during July 2021 and September 2021. See, Exhibit 43, Production Report

Summary.

228. Everett Larabee's Farms 2484 and 2485 are approximately 3 miles from

Goldmine's Farm 2068.

229.  The farm acres at issue are non-irrigated, and yet Everett Larabee reported the soybeans on Farms 2484 and 2485 suffered a loss from drought in July and September 2021, but there was no damage reported to the soybeans on Farm 2068.

| County | Named Insured | Farm Number | Total certified production | Reported Acres | Yield/Acre (bushels) |
|--------|--------------|-------------|---------------------------|----------------|----------------------|
| Perquimans | Everett | 2484 | 99.9 | 5.58 | 17.9 |
| Perquimans | Everett | 2485 | 2,397.6 | 116.76 | 20.5 |
| Perquimans | Goldmine | 2068 | 36,652.4 | 626.05 | 59.0 |

230.  From July 1, 2021, through September 30, 2021, the following is a summary of the rainfall recorded on the farms at issue (based upon weather data from PRISM reports).

Farm 2485:  12.42 inches of rainfall



Farm 2068:  13.29 inches of rainfall



231.    The farms of Everett Larabee and Goldmine experienced similar precipitation.

232.    On information and belief, Defendants cannot explain the extreme difference in yields between the farms.

233.    On information and belief, Defendant Everett Larabee's actual farming operation, based upon an accurate representation of the farming operation controlled by him, would demonstrate his crop yields would have been roughly consistent with the county averages per acre.

234.    On information and belief, Defendants made false statements to RMA and FSA that included statements that concealed actual production and failed to disclose production shifting between related parties that were RMA insured in 2018 through 2022.

40

235.    Defendant Everett Larabee shifted the yields between and among the insured farms that he controlled, and concealed actual production in order to obtain additional RMA Payments, including as set forth above.

**H.    Defendants Fraudulently Obtained FSA Payments In The Names Of Straw Farming Operators.**

236.    The FSA Farm Operating Plan For Payment Eligibility forms state that only a "Producer" is eligible to earn any payments, and a Producer, in turn, was defined as an owner, operator, landlord, tenant, or sharecropper who both (1) shares in the risk of producing a crop and (2) is entitled to share in the crop available for marketing from the farm or would have shared had the crop been produced. See 7 C.F.R. § 718.2 (defining "Producer").    See Exhibit 44, Form 902 Farm Operating Plan for relevant years.

237.    The CCC-902 Form states in the first section:

> "This form is to be completed for a legal entity, including a joint operation, that is seeking benefits from the Farm Service Agency (FSA) under one or more programs that are subject to the regulations at 7 CFR Part 1400. This form collects farming and other information about the entity that receives program benefits directly using the tax identification number listed in Part A. This form also collects information about the members of such entity. A person who receives program benefits directly as an individual must complete a CCC-902I with respect to that person's operation. Payment eligibility is based upon the contribution of certain inputs to a farming operation such as land, capital, equipment, labor, and management by the entity listed in Part A. The information on this form will be used by FSA to determine payment eligibility and limitation of payments by direct attribution."

See Exhibit 44, Farm Operating Plan.

238.    The USDA requires each Producer to file a farm operating plan, as well as other documents with FSA for each crop year.

41

239.    Defendant Everett Larabee took advantage of the FSA's benefit programs by circumventing payment caps using Straw Farming Operations in 2018, and following years.

240.    As an example, Congress established the Price Loss Coverage ("PLC") and County Agricultural Risk Coverage ("ARC") programs when it passed the Agricultural Act of 2014, Pub. L. No. 113-79 ("2014 Farm Bill"), and continued them with passage of the Agriculture Improvement Act of 2018, Pub. L. No. 115-334) ("2018 Farm Bill").  Both the PLC and ARC programs calculated benefit payments, in part, on a farmer's farming acreage in a given county, as well as the commodity or crop produced.

241.    Payments under the ARC and PLC programs made by the United States through FSA should only be provided to a recipient who qualified under the relevant regulations for participation in the program.

242.    At all relevant times, to enroll farmland in either the ARC or PLC programs, a farmer was required to truthfully complete and sign a Form CCC-866 if that person elected to participate under the 2018 Farm Bill.

243.    When completing and signing a Form CCC-861 or Form CCC-866 for enrollment into the ARC or PLC programs, an enrollee agreed to abide by the terms of the program contract appendices, which, for purposes of this case, are consistent under both the Farm Bills and are collectively hereafter referred to as the "PLC/ARC Contract."

244.    The terms of the PLC/ARC Contract reflected the program eligibility regulations promulgated by the USDA for FSA benefit program eligibility and codified in Title Seven of the Code of Federal Regulations, Part 718.

42

245. The PLC/ARC Contract stated that only a "producer" is eligible to earn any payments under these programs.

246. The PLC/ARC Contract further required each producer to file a farm operating plan with FSA for each crop year.

247. The Form CCC-502 or CCC-902 required the producer to answer a series of questions regarding the farming operations on this land to determine whether the individual requesting benefits truly was a producer with an interest in the crop. For example, the form required the producer to list the source(s) of capital, equipment, custom services, labor, and management used in farming the land.

248. When the individual requesting benefits signed a Form CCC-902 and submitted it to FSA, the individual certified the following:

I certify that all the information entered on this document and any supporting documentation is true and correct. I understand furnishing incorrect information will result in forfeiture of payments and may result in the assessment of a penalty. I will timely provide written notification to the Farm Service Agency Committees of any changes in this farming operation.

See Exhibit 44, Farm Operating Plan.

249. Based on these certifications, FSA provided benefit payments to producers each crop year based on their enrollment in the PLC or ARC programs.

250. During 2018 and 2019, the PLC/ARC Contract restricted a person from receiving, directly or indirectly, PLC and ARC payments in excess of $125,000 per crop year.

251. The PLC/ARC Contract contained the following warnings against, and penalties for, fraud.

43

a. If FSA determined that a person erroneously represented any fact affecting a determination by FSA under the program contract, that person would not be allowed benefit payments.

b. If FSA determined that the misrepresentation was intentional or fraudulent, or if the person knowingly adopted a scheme or device which tended to defeat the purposes of the program contract, that person would forfeit all rights to payment on each farm in which the person had an interest and would be required to refund to FSA all payments, plus interest.

c. Filing false documents could lead to a five-year disqualification for payments.

d. Any scheme or device to increase the amount of the payment under a program contract would, irrespective of whether it was related to a maximum payment limitation, be grounds for denying payment under the program contract involved or for demanding repayment if payment had already been made.

e. Such fraudulent conduct could also incur liability under various criminal and civil statutes, including 31 U.S.C. § 3729 (i.e., the False Claims Act).

252. Using these straw entities as described above, Everett Larabee was able to receive, indirectly, much higher payment amounts by participating in multiple FSA programs as if he were multiple separate and distinct farming operations, instead of one large farming operation.

253. Defendant Everett Larabee devised a Straw Farming Operator scheme to get around the ceiling of benefit payments per crop year by placing certain farmland under the names of other Producers, including Goldmine and Lawrence Larabee.

254. On information and belief, from at least 2018, Defendant Everett Larabee executed this scheme, setting up Straw Farming Operations and enrolling farming operations with FSA under the names of Goldmine Harvest and Lawrence Larabee (collectively, the "FSA Straw Farming Operators").

255. These FSA Straw Farming Operators collected program payments from FSA for these Straw Farming Operations, and Defendants continued to maximize

44

Defendant Everett Larabee's own benefit payments up to or around the FSA benefit payment ceiling.

256. Defendant Everett Larabee, on behalf of the FSA Straw Farming Operators, submitted farm operation plans to FSA for the Straw Farming Operations by completing and signing Forms CCC-902s and CCC-502s.

257. In these forms, the FSA Straw Farming Operators fraudulently certified to FSA that they were "Producers" (i.e., that they (1) were entitled to share in any crop produced and (2) shared in the risk of producing that crop).

258. This was false because the crops were planted, cultivated, and harvested by Everett Larabee, who alone profited from the crop production and bore all the risk of producing these crops.

259. In the Forms CCC-902 and CCC-502, the FSA Straw Farming Operators also falsely listed sources of capital, equipment, labor, and farm management in order to support their claims that they - and not Everett Larabee - were the Producers of these crops.

260. All of these records submitted to FSA by the Everett Larabee in the name of the Straw Farming Operators were false and in support of the fraudulent claims for FSA payments from the federal government.

261. FSA, in reliance on the false representations and certifications made in the applications for Crop insurance as well as Forms CCC-902, CCC-502, AD-3114, AD-3117, and FSA-578 submitted by the Straw Farming Operators, made multiple program payments to the Straw Farming Operators to which they were not entitled, including but not limited to the ARC and PLC programs set out above, as well as the Market

45

Facilitation Program ("MFP"), Coronavirus Food Assistance Programs ("CFAP" and "CFAP2") and the Wildfire and Hurricane Indemnity Program ("WHIP+").

262. On information and belief, the Straw Farming Operators returned their ill-gotten gains to Defendant Everett Larabee, either directly into bank accounts or through transfers to or for the benefit of Everett Larabee.

263. As described above, Defendants caused the Straw Farming Operators to submit false claims for FSA benefit payments they were not entitled to receive, resulting in the FSA paying thousands of dollars in payments for these false claims.

## DEFENDANTS KNOWINGLY CAUSED FALSE CLAIMS

264. Defendants knew that RMA and FSA forms, certifications and claims for payment were false, or at least deliberately ignored and/or recklessly disregarded the truth or falsity of those certifications and claims.

265. Defendants made, used and caused false records, including false applications, false Acreage reports, false Production Worksheets, and false eligibility statements, false certifications as to insurable interests and farming operations, false invoices, and other false statements to support their false claims to RMA and FSA.

266. From 2018 to 2022, Defendant Everett Larabee systematically submitted claims without the insurable interest and other eligibility conditions required as described above.

267. Defendants Everett Larabee, Goldmine and Jason Winslow conspired together to submit or cause false claims and false statements to RMA and FSA.

46

268. On information and belief, Defendants caused and used false records, including falsely recording farm acreage and failing to accurately distinguish between the separate farming operations, in order to obtain additional RMA and FSA payments.

269. From 2018 to 2022, Defendants Everett Larabee, Goldmine and Jason Winslow demonstrated a pattern of reckless disregard or deliberate ignorance toward concerns about claim fraud, including false claims to RMA and FSA.

270. Defendant Everett Larabee entered into tolling agreements with the Government, tolling the limitations period and any time-based defenses from September 2, 2020, through January 20, 2026.

**FIRST CAUSE OF ACTION**
**False Claims Act: Submission of False Claims**
**(31 U.S.C. § 3729(a)(1)(A))**

271. The Government re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

272. By virtue of the acts and described above, Defendants knowingly (including reckless disregard and deliberate ignorance) presented or caused to be presented to the United States false or fraudulent claims for payment in violation of the False Claims Act (31 U.S.C. § 3729(a)(l)(A)), in that the Defendants claimed RMA and FSA payments that were false and ineligible for payment, and because the claims violated policies, regulations, and instructions.

273. The actions and omissions alleged in this complaint constitute a fraudulent course of conduct.

274. Each claim that the Defendants knowingly (including reckless disregard and deliberate ignorance) presented or caused to be presented or payment was a materially false or fraudulent claim, in violation of the False Claims Act.

275. Alternatively, each claim that the Defendants knowingly (including reckless disregard and deliberate ignorance) presented or caused to be presented in violation of policies, regulations, and instructions constituted an implied false certification in violation of the False Claims Act.

276. The false or fraudulent claims that the Defendants knowingly (including reckless disregard and deliberate ignorance) presented or caused to be presented were material to the payment of funds, and caused the Government to disburse federal funds to which the Defendants were not entitled.

277. By reason of the foregoing, Plaintiff United States suffered actual damages in an amount to be determined at trial, but in any event no less than $2,000,000.

### SECOND CAUSE OF ACTION
### False Claims Act: False Statements Material to a False Claim
### (31 U.S.C. § 3729(a)(1)(B))

278. The Government re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

279. By virtue of the acts and omissions described above, Defendants knowingly (including reckless disregard and deliberate ignorance) made or used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of the False Claims Act (31 U.S.C. § 3729(a)(l)(B), as amended) in that the records and statements that the Defendants made or used, or caused to be made or used,

48

to claim payment were false and the Government payments claimed were not eligible because the claims violated RMA and FSA policies, regulations, and instructions.

280.    The actions and omissions alleged in this complaint constitute a fraudulent course of conduct.

281.    The false or fraudulent statements or records that the Defendants knowingly (including reckless disregard and deliberate ignorance) made or used, or caused to be made or used, were material to the payment of RMA and FSA funds, and caused the Government to disburse federal funds to which the Defendants were not entitled.

282.    By reason of the foregoing, Plaintiff United States suffered actual damages in an amount to be determined at trial, but in any event no less than $2,000,000.

### THIRD CAUSE OF ACTION
### False Claims Acts: Reverse False Claims
### (31 U.S.C. § 3729(a)(1)(G))

283.    The Government re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

284.    By virtue of the acts described above, Defendants knowingly concealed, or knowingly and improperly avoided or decreased, an obligation to repay monies Defendants were paid by USDA in excess of the amounts authorized, which was in violation of the False Claims Acts, 31 U.S.C. § 3729(a)(1)(G), in that Defendants had knowledge they had improperly obtained more than authorized.

285.    By reason of the foregoing, the Government suffered actual damages in an amount to be determined at trial.

49

## FOURTH CAUSE OF ACTION
### False Claims Act: Conspiracy
### (31 U.S.C. § 3729(a)(1)(C))

286.   The Government re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

287.   By virtue of the acts and omissions described above, Defendants each conspired to knowingly (including reckless disregard and deliberate ignorance) present or cause to be presented false or fraudulent claims to RMA and FSA; and to knowingly (including reckless disregard and deliberate ignorance) make or use, or cause to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act (31 U.S.C. § 3729(a)(l)(C), as amended).

288.   As described above, Defendants conspired with others to submit claims for RMA and FSA payments without satisfying requirements because the claims violated RMA and FSA policies, regulations, and instructions, and to make and use false records and statements to support these false claims.

289.   By reason of the foregoing, Plaintiff United States suffered actual damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Common Law Fraud

290.   The Government re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

291.   The above-described affirmative false claims are (1) false representations or concealments of material facts, (2) reasonably calculated to deceive the RMA and FSA Programs, (3) made with intent to deceive the Programs, (4) which did in fact deceive

50

the Programs, and (5) resulted in damage to the RMA and FSA Programs.  Based on the certifications in applications and forms, the Government reasonably relied on the applications and certifications that insurable interests and otherwise satisfied requirements.

292.  As a result of the Defendants' false claims, false certifications, false records, and fraudulent course of conduct described above, the payments were not eligible or the claims were in violation of RMA and FSA policies, regulations, and instructions, which the Government would not have paid had the Defendants not presented or caused to be presented false claims for payment; and made, used, or caused to be made or used, false records and statements material to false or fraudulent claims, or conspired to do the same.

293.  By virtue of the Defendants' actions and omissions, Plaintiff United States, acting on the accuracy and truthfulness of the information contained in the claims submitted, paid certain sums of money to which the Defendants were not entitled, and the Defendants are thus liable to account for and repay such amounts to be determined at trial.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment

294.  The Government re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

295.  By virtue of the acts and omissions described above, by presenting or causing to be presented claims for RMA and FSA payment that violated the applicable Program policies, regulations, and instructions, by making or using, or causing to be

51

made or used, false records and statements material to false or fraudulent claims, and by conspiring to do the same, Defendants received and/or benefited from certain federal funds to which they were not entitled.

296.    As a result of the acts and omissions set forth above, the Defendants were unjustly enriched at the expense of the United States, under circumstances dictating that, in equity and good conscience, the money should he returned to the Government.

297.    By reason of the foregoing, Plaintiff United States suffered actual damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**Payment By Mistake**

298.    The Government re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

299.    By virtue of the acts and omissions described above, by presenting or causing to be presented claims for RMA and FSA payments that violated the applicable Program policies, regulations, and instructions, and by making or using, or causing to be made or used, false records and statements material to false or fraudulent claims, Defendants caused the United States to pay certain federal funds to which the Defendants were not entitled.

300.    At the time the United States made such payments, the Government was unaware of the Defendants' conduct described herein.  The Government's erroneous belief that the Defendants were submitting valid claims was material to making the payments at issue. Had the Government known of the conduct at issue, it would not have made the payments.

52

301.    As a result of the acts set forth above, the United States has been damaged and is entitled to recover the money that was paid by mistake.

302.    By reason of the foregoing, Plaintiff United States suffered actual damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States respectfully request that the Court enter judgment against Defendants:

1.    For the First, Second, Third and Fourth Causes of Action, treble damages, plus the costs of investigation and prosecution, and civil penalties for each false claim as allowed by law;

2.    For the Fifth, Sixth, and Seventh Causes of Action, for the amount the United States paid as a result of these Defendants' fraud, the amount these Defendants were unjustly enriched, the amount the United States mistakenly paid, and/or the amount the United States paid to which these Defendants were not entitled;

3.    For the costs of this action, plus interest, and investigative costs as provided by law;

5.    That a trial by jury be held on all issues so triable; and

6.    For any other relief that the Court deems just and proper.

Respectfully submitted, this 20th day of January, 2026.

W. ELLIS BOYLE
United States Attorney


BY:    /s/ NEAL I. FOWLER
        NEAL I. FOWLER
Assistant United States Attorney
Civil Division
150 Fayetteville Street
Suite 2100
Raleigh, NC 27601-1461
Telephone: (919) 856-4049
Facsimile: (919) 856-4821
E-mail: neal.fowler@usdoj.gov
NC Bar #27371